**Rodney Charles RACHAL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71569.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 17, 1996.

Rehearing Denied March 20, 1996.

---

George McCall Secrest, Jr., Houston, for appellant.

J. Harvey Hudson, Assist. Dist. Atty., Houston, Robert A. Huttash, State's Atty., Austin, for State.

## OPINION

WHITE, Judge.

In October 1992, appellant was tried and convicted of capital murder under Texas Pe-

nal Code § 19.03. The offense, a double robbery-murder, was committed in October 1990. The jury affirmatively answered the two special issues submitted under Article 37.071(b).[1] Appellant was sentenced to death as mandated by Article 37.071(e). Article 37.071(h) provides direct appeal to this Court. Appellant raises fifteen points of error. We affirm.

■■■ In point of error fourteen appellant challenges the sufficiency of the evidence to establish that appellant "would commit criminal acts of violence in the future which would constitute a continuing threat to society." Art. 37.071(b)(2). In answering issues raised under Article 37.071(b), the jury may consider evidence admitted at both the guilt-innocence and punishment stages of trial. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim. App.1987). The jury is the sole judge of the weight of the evidence and may choose to believe all, some, or none of it. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim.App.1986). Thus, sufficiency reviews on appeal require that while examining the evidence in the light most favorable to the verdict, we ask whether any rational trier of fact could have found the elements in question beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Burns v. State*, 761 S.W.2d 353, 356–357.[2] Reviewing the record before us under the *Jackson* standard, we must uphold the jury's verdict.

The record reveals, largely from appellant's own confession, the following facts supporting the verdict: On the evening of October 25, 1990, appellant visited his friend, Michelle Dupree and her roommate, Gwendolyn Frank. Three others were present: Tommy German, Howard Gibson, and Felicia Duplachane. The group was smoking marihuana and taking Valium (diazepam). Appellant and German talked about committing a robbery. When all but Frank had agreed to participate in the aggravated robbery, firm plans were laid. The women, dressed seductively, would lure male victims to a location where the male conspirators would ambush and rob the victims at gun point. While Duplachane and Dupree changed into "whoring" clothes, the men got their guns.

The group, joined by a driver identified only as Ant, went to an apartment complex selected for its high pedestrian traffic. Spotting three men ambling about the complex, Duplachane and Dupree walked toward them so as to catch their attention. The three male victims, C. Washington, A. Robinson and T. Davis, beguiled by Duplachane and Dupree, followed the women, uttering lewd exclamations. As they passed by appellant, the women signaled that these men were the targets. Appellant approached the victims, exposed his .357 caliber handgun and ordered them to lie down. As appellant began searching the three men, his accomplices, German and Gibson, joined him. Two male bystanders became aware of the robbery and fled. Appellant yelled for his accomplices to stop them. Two shots were fired at the fleeing men. Without provocation, German then shot one of the prostrate victims, Davis, in the back. Appellant, also without provocation, shot the other two victims, Washington and Robinson, in the head. Washington and Davis were fatally wounded. Robinson survived.

Meanwhile the fourth victim, T. Fonteno, was on the grounds of the apartment complex. He heard gun shots and froze upon seeing appellant turn a corner with gun in hand. Appellant approached Fonteno demanding dope and money. Fonteno replied that he had neither and surrendered his wallet to appellant. Appellant ordered Fonteno on his knees, but fearing execution, Fonteno refused, pleading with appellant that there was no need to shoot him. German joined appellant and raised his shotgun to strike

---

1. All article references are to the Texas Code of Criminal Procedure unless otherwise indicated.

2. Appellant's argument invites us to reweigh the mitigating evidence against the aggravating evidence. We have long rejected such arguments as inappropriate, explaining that if the jury's verdict is to be respected, it must be upheld if supported by the evidence even if with "some trepidation." *Burns v. State*, 761 S.W.2d 353, 356–357 (Tex. Crim.App.1988).

Fonteno with it. As Fonteno raised his arms to protect himself from the blow, appellant shot him in the lower chest and abdomen.

This record reveals a planned ambush, the cold and senseless murder of two men, and the near-fatal shooting of two other men wholly without provocation. Appellant personally shot three of the four victims. The victim killed by appellant was shot in the head at close range as he lay helplessly prostrate on the ground. Appellant also shot one of the surviving victims at close range in the head. Appellant commanded his cohorts to shoot at the two bystanders who fled and he also personally shot Fonteno, leaving him for dead. And, these shootings occurred, as planned, within the precincts of an apartment complex, accentuating appellant's gross disregard for human life.

Nor was this appellant's first offense. During his sentencing trial, appellant's criminal record was introduced, establishing that appellant had previously been convicted of evading arrest, misdemeanor assault, criminal mischief, and unlawful possession of a weapon. Appellant's lengthy juvenile record included theft and burglary for which he had been placed under the supervision of the Harris County Juvenile Probation Department; this probation was ultimately adjudicated because of various violations. An officer from Juvenile Probation testified that she "knew he was headed for violence." Three witnesses also testified that appellant had a bad reputation for violence and law-breaking, and two other witnesses testified from personal knowledge that appellant was violent and aggressive while incarcerated and awaiting trial. Evidence was introduced that only months before the tried offense, appellant had shot and killed a man known as Charles Wilson.[3]

Evidence indicated that appellant was without regret or remorse for any of the killings. Indeed, such was appellant's lack of reflection and remorse on the taking of Charles Wilson's life, that soon thereafter he actively sought to place himself in the position to take more lives and did so. *E.g.,*

*Williams v. State,* 668 S.W.2d 692 (Tex.Crim. App.1983); *See also Wilkerson v. State,* 881 S.W.2d 321, 343 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994) (Judge Baird dissenting) (explaining importance of lack of remorse as evidence of future dangerousness). And, no sooner had appellant literally turned the corner from having fatally injured two of his victims, than he again attempted robbery and murder of another. *Wilkerson,* 881 S.W.2d at 325–326. And, again we note that his shooting spree occurred in a heavily trafficked residential area where every bullet fired showed callousness and disrespect for human life.

The evidence introduced at trial established appellant's propensity for casual shooting and killing. This utter disregard for human life supports the jury's finding that appellant indeed poses a continuing threat to society as contemplated in Article 37.071(b)(2). **Appellant's fourteenth point of error is overruled.**

■ In his first point of error, appellant argues that the trial court erred in admitting evidence during his punishment trial that he had a few months previous to the tried offense been investigated, arrested, and ultimately no-billed in the fatal shooting of a man known as Charles Wilson. During his sentencing trial, it was introduced, over appellant's objection, that in May 1990, he was arrested and charged in the murder of Charles Wilson. It was also introduced that the charges were ultimately dismissed when no-billed by a Grand Jury, and the State's attorney testified that he had investigated the homicide and personally believed that "the evidence was such that a fair jury would probably have concluded that it was self-defense." Appellant argues that since the extraneous homicide was found to be "justifiable and lawful" and committed in "self-defense," it should not have been admitted against him. Appellant does not dispute that he committed the homicide, but challenges the relevance of such evidence and alternatively argues that it is substantially more

---

**3.** The evidence suggests that both the present murders and the murder of Wilson occurred in some relationship to drug dealings.

prejudicial than probative. Tex.R.Crim. Evid.R. 402 and 403.

■ Appellant overstates the meaning of a no-bill. The Grand Jury's no-bill of the Wilson homicide does not mean it was justified, lawful, or in self-defense. The Grand Jury is without authority to make such findings; its authority and duty is limited to inquiring into criminal accusations and determining whether evidence exists to formally charge a person with an offense. Arts. 20.09, 20.19; and Art. 21.01 (defining indictment). A Grand Jury's no-bill is merely a finding that the specific evidence brought before the particular Grand Jury did not convince them to formally charge the accused with the offense alleged. Thus, the issue here is whether evidence of an extraneous homicide, upon which a Grand Jury no-billed the appellant, is admissible against him in the sentencing phase of a capital murder trial.

■ We recently addressed and answered an indistinguishable question in *Burks v. State*, 876 S.W.2d 877, 908 (Tex. Crim.App.1994), *cert. denied,* — U.S. —, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995). Burks asserted that the trial court erred during his sentencing trial by admitting evidence, including photographs, of an unindicted murder in which he had been charged and arrested. *Id.* The district attorney testified that he had dropped the murder charges against Burks because he believed the evidence insufficient to convict Burks. *Id.* at 909. In *Burks*, we ultimately held that the trial court had not erred. *Id.* We treated the homicide evidence in *Burks* as we would any other evidence of unadjudicated extraneous misconduct, thereby implicitly rejecting any categorical exclusion of extraneous mis-

conduct left unindicted. *Id.* Today we expressly hold that misconduct left unadjudicated because the evidence may possibly be insufficient to formally indict is like any extraneous offense evidence introduced during the sentencing stage of a capital murder trial; if it is clearly proven, relevant, and more probative than prejudicial, it is admissible.[4] *Burks,* 876 S.W.2d at 908–910.

■ Since appellant does not dispute his commission of the extraneous homicide, we move directly to review its relevance. In reviewing relevance, we examine every case on its own facts to determine whether the extraneous transaction is relevant. *Id.* at 908. As long as the trial court's ruling was within the zone of reasonable disagreement, the trial court did not abuse its discretion and its ruling will be upheld. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). But, if it cannot be concluded from common reasonable experience that the evidence has a tendency to make the existence of a fact of consequence more or less probable then the trial court's decision was not within the zone of reasonable disagreement and it abused its discretion. *Id.* Moreover, when it is clear that what was perceived by the trial court as common experience is really no more than the operation of a common prejudice not borne out in reason, the trial court has abused its discretion. *Id.*

Citing *Burks* and using as a model the definition of relevant evidence provided in Rule 401 of the Texas Rules of Criminal Evidence, we hold that the trial court could reasonably find the fact that appellant had killed Charles Wilson was probative of at least his dangerousness to society, and thus relevant to that issue.[5] That appellant know-

---

**4.** The admissibility of extraneous offense evidence offered at punishment in capital murder cases is governed by Article 37.071(a) of the Texas Code of Criminal Procedure. *Kemp v. State,* 846 S.W.2d 289, 307 (Tex.Crim.App.1992). The trial judge has wide latitude in admitting or excluding such evidence, whether it is adjudicated or unadjudicated. *Id.* But, the State must still "clearly prove" that an offense was committed and that the accused was its perpetrator. *Id. Cf. Harrell v. State,* 884 S.W.2d 154, 158–159 (Tex.Crim.App.1994) (clearly means beyond a reasonable doubt). And, Article 37.071(a) does not negate the requirements that the evidence be

relevant to the jury's determination of a capital defendant's deathworthiness and that its probative value is substantially outweighed by its inflammatory or prejudicial potential. *Id. See also* Tex.R.Crim.Evid. 401, 402, and 403; *See also* S. Goode, et al., 1 *Texas Rules of Civil and Criminal Evidence; Texas Practice* Sec. 404.7 (1993).

**5.** Rule 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of

ingly and willingly placed himself in, and sought after, circumstances facilitating homicide soon after Wilson's killing, demonstrates a callousness and lack of reflection about taking human life which tends to increase the probability that appellant is a future danger.[6] *See* point of error fourteen, *supra*.

In reviewing the trial court's determination of the probative and prejudicial value of evidence under Rule 403, we do not make a *de novo* determination, but reverse only upon a clear abuse of discretion. *Montgomery*, 810 S.W.2d at 392. But, reviewing for abuse of discretion in this context requires more than deciding that the trial judge did in fact conduct the required balancing between probative and prejudicial values; the trial court's determination must be reasonable in view of all relevant facts. *Id.* at 392. Accordingly, if the record reveals criteria reasonably conducing to a risk that the probative value of the tendered evidence is substantially outweighed by unfair prejudice, then the trial court acted irrationally in admitting it and abused its discretion. *Id.*

Reviewing the record, we cannot hold the that trial court abused its discretion. We have already discussed the strong probative value of the Wilson homicide regarding appellant's future dangerousness. And, while evidence of an extraneous murder is always potentially prejudicial, three factors palliate the prejudicial effect of the extraneous homicide in this case. First, when the evidence was introduced, appellant had already been found guilty of capital murder, and the jury knew that he had shot, with the intent to kill, two other men besides the victim and Wilson. Secondly, appellant did not deny that he killed Charles Wilson. Thirdly, the jury was presented with the entire truth about the Wilson homicide. The State's attorney testified that the Grand Jury had not indicted appellant, and that he agreed with the conclusion that the Wilson

homicide was probably committed in self-defense. Under these circumstances it was not irrational to conclude that the probative value of the evidence outweighed its prejudicial effect. The trial court was within its discretion in admitting the evidence that appellant shot and killed Charles Wilson. **Appellant's first point of error is overruled.**

Appellant avers in his second point of error that the trial court erred in failing to suppress his written confession. He argues that his confession should have been suppressed as a matter of law because his allegations that his confession was coerced, involuntary, and the product of an unlawful inducement, were uncontroverted at the pretrial suppression hearing. Appellant's argument is based on the Fifth Amendment of the United States Constitution, Article I, sections 10 and 19 of the Texas Constitution and Articles 38.22 and 38.23.[7]

At the pretrial suppression hearing, appellant testified that Detective Brown of the Houston Police Department had asked the only other police officer present, Detective Phillips, for a few minutes alone with appellant. Appellant alleged that during their brief time alone, Brown threatened him with the death penalty and promised that if he gave a confession, appellant would not receive capital punishment. Appellant also testified that the officers had not warned him of his rights and that he had not read the statement when he signed it.

Detective Phillips testified at the pretrial hearing that appellant had been given the requisite warnings, had voluntarily and knowingly given a statement, had read the warnings accompanying the written statement, had initialed each to indicate his waiver, and that appellant had read his statement, initialed the corrections to it and then signed it. Phillips also testified that appellant had initially denied any knowledge of the

the action more probable or less probable than it would be without the evidence.

6. Indeed the evidence suggests that the murder of Wilson occurred in the course of an illegal drug transaction; likewise the evidence suggests that illegal drugs also had a part in the murders for which appellant is being tried.

7. Appellant does not raise specific arguments under the Texas Constitution or the Texas Code of Criminal Procedure. Having raised no distinct State arguments, we will not address this point on these grounds. *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim.App.1992); Tex. R.App.P. 74 and 210.

offense, but that at Brown's request he had stepped out of the office for about ten minutes and that when he returned, appellant was willing to provide a statement.

On cross-examination at the pretrial hearing, appellant did not deny that he had initialed each of the rights enumerated at the beginning of his written confession. He agreed that he had read the warnings, understood them, and initialed each to indicate his waiver of the right described therein. He continued to deny having read the statement before signing it and having initialed the corrections made to it.

The state did not call Detective Brown to the stand during the pretrial hearing. Instead, the State relied on Detective Phillips' testimony, appellant's cross-examination, and its own argument that appellant was simply not credible. The trial court denied appellant's motion to suppress but failed to enter findings of fact or conclusions of law until the appeal of this case.[8] In her findings the trial judge states:

> The defendant's allegations of intimidation and threats by Detective Brown were not credible, and the court is convinced beyond a reasonable doubt that defendant's testimony in this regard is not worthy of belief. In fact, the court specifically finds that no threats, promises or other inducements were made by police to obtain the defendant's confession.

During the trial on the merits, Detective Brown was called by the State and testified, without objection from appellant, that appellant had offered his confession without duress, coercion, threat, or unlawful inducement. Defense counsel examined Detective Brown regarding appellant's specific allegations and Brown specifically denied them.

Appellant argues that we must in our review of the record ignore the testimony of Detective Brown because it was not introduced until the trial on the merits after the trial court's ruling was made. Albeit, in a sense logical—in that the trial court's decision was based only on the evidence introduced during the suppression hearing—we must under the facts of this case reject appellant's argument.

In reviewing the suppression determination, we are deferential to the trial court and will reverse only if it abused its discretion, i.e., if the decision is unsupported by the record. *Upton v. State,* 853 S.W.2d 548, 552 (Tex.Crim.App.1993). And, in determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *See, e.g., Hardesty v. State,* 667 S.W.2d 130, 135 n. 6 (Tex.Crim.App.1984). However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits. *Id.* Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review. *Id.* at 135; *See also Webb v. State,* 760 S.W.2d 263, 272 n. 13 (Tex.Crim.App.1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). Moreover, it would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless. Tex.R.App.P. 81(b)(2). Thus, in the case at bar, since appellant did not object when the State reintroduced the suppression issues and, indeed, fully participated in the relitigation of the issue in its cross-examination of Detective Brown, we may properly consider Detective Brown's trial testimony in our review of the trial court's suppression determination.

At trial Detective Brown specifically denied appellant's allegations of duress, threats, or improper inducement in persuading appellant to offer a statement. Thus, the

---

8. Appellant complained in point three that the trial court had not entered its "Findings of Fact and Conclusions of Law" regarding its denial of his Motion to Suppress his written confession as required by Article 38.22 § 6. This point is moot; the trial court entered its "Findings of Fact and Conclusions of Law" on October 7, 1994. **Appellant's third point of error is overruled.**

record does show that the State did dispute appellant's allegations, and it supports the trial court's finding that appellant's confession was admissible. **The trial court did not abuse its discretion; appellant's second point of error is overruled.**

■ In points of error four and five, appellant argues that the trial court erred in dismissing veniremembers H. Kaupp and D. Siefke, respectively, upon the State's challenges for cause. The State challenged Kaupp and Siefke on grounds that they were unable to follow the law and fulfill their duty as jurors because of their views on the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968); *Nelson v. State,* 848 S.W.2d 126, 133 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). Appellant argues that the record does not support the trial court's decision.

■ A veniremember may not be struck for cause merely because he or she is opposed to the death penalty. *Witherspoon,* 391 U.S. at 522, 88 S.Ct. at 1777 (1968). A veniremember may be struck, however, if her views prevent or substantially impair the performance of her duties as a juror in accordance with the instructions given and the oaths taken. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). For example, a veniremember may be properly struck for cause if his views of the death penalty would place a burden of proof greater than "beyond a reasonable doubt" on the State. *Chambers v. State,* 866 S.W.2d 9, 21 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). Our review of decisions to grant or deny challenges for cause is deferential to the trial court because of its superior position in evaluating the venirepersons's demeanor and responses, and the context and tone in which questions are asked and answered during voir dire. *Cantu v. State,* 842 S.W.2d 667, 681 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993), [*citing, Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)]. When the potential juror's answers are vacillating, unclear, or even contradictory, the trial judge's superior point of view is particularly important and deserving of our deference. *Cantu,* 842 S.W.2d at 682. Thus, we review the totality of the voir dire testimony and hold that the trial court abused its discretion only if the record does not support its decision. *Id.*

■ The record reveals that Kaupp vacillated. He indicated some reservations about the death penalty because of its irrevocable finality, but insisted that his reservations would not bias his deliberations, though he would be inclined toward life imprisonment over the death sentence if given a choice. When asked specifically about the special issues under Article 37.071, Kaupp wavered admitting that his views "could be a problem." But, then the State explained that it was only required to prove that the answers to the special issues should be affirmative and that it was not required to justify the sentence of death beyond that. The State then asked appellant if his views would impair his ability to answer the special issue honestly under these circumstances, and Kaupp answered "Yes." *Id.* Attempting to rehabilitate Kaupp, appellant asked, rather ambiguously, whether Kaupp could be fair to the State regarding the special issues, and Kaupp answered that he "could try." The voir dire of Kaupp presents the circumstances under which we owe deference to the trial court. The record establishes that at best Kaupp would try to be impartial and follow the law, but he was uncertain about his ability to do so. When the venireman is persistently uncertain about his ability to follow the law, we will not second guess the trial court from a cold record. The record of Kaupp's voir dire supports the trial court's decision to dismiss him on the State's challenge.

Similarly, venirewoman Siefke stated unequivocally that her religious views brought her in conflict with her duty as a juror. She told the trial court that her views would probably influence her analysis so as to avoid the death penalty. When asked specifically whether she could follow the law as instructed she vacillated several times, stating that she probably could but concluded that she did not know if she could. Siefke's voir dire presents another juror who vacillated on her

ability to follow the law, and establishes with certainty only that she did not know whether she could follow the law.

Appellant cites to our recent holding in *Riley v. State,* 889 S.W.2d 290 (Tex.Crim. App.1993). We refer appellant to our clarifying "Opinion on State's Motion for Rehearing." *Riley v. State, supra.* On rehearing we explained that the venirewoman in *Riley* was improperly dismissed because after being informed of the statutory scheme requiring jurors to simply answer the special issues affirmatively or negatively, the venirewoman stated that regardless of her own views, she would have to follow her oath and answer the special issue honestly; she was unequivocal about her ability, indeed, her duty to follow the law "never waver[ing] in her assurance that she could nonetheless give affirmative answers to the special issues if the evidence convinced her beyond a reasonable doubt that it should be so answered." *Id.* at 298. This was not the case with either Kaupp or Siefke. We cannot under these facts of this case hold that the trial court abused its discretion. Since the record supports the trial court's decision, **appellant's fourth and fifth points of error are overruled.**

▊ In his sixth and seventh points of error, appellant alleges the trial court committed *Garrett* error in sustaining the State's challenge for cause to two veniremembers. *Garrett v. State,* 851 S.W.2d 853, 860 (Tex. Crim.App.1993). In point of error six, appellant complains about the dismissal of venirewoman B. Terrell. Terrell testified that even if she thought beyond a reasonable doubt that the State had proved that a capital murder defendant would probably commit criminal acts of violence constituting a threat to society, Article 37.071(b)(2), she would nevertheless vote negatively on that special issue unless the State also presented evidence that the defendant had a prior felony conviction. In point seven, appellant complains of the dismissal of venireman R. Adams. Adams repeatedly and unequivocally stated that even if convinced beyond a reasonable doubt that a defendant would

commit criminal acts of violence constituting a threat to society, he would, nevertheless, require evidence that a defendant would kill another human being before he affirmatively answered the second special issue. Art. 37.071(b)(2). Both veniremembers were dismissed on the State's challenge that they were biased against the law upon which it was entitled to rely. *Fuller v. State,* 829 S.W.2d 191, 200 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993); Art. 35.16(b). Appellant concedes that under *Fuller* the two challenged veniremembers were properly dismissed because they would require something other than what the law requires to find a defendant deathworthy. But, appellant argues that *Fuller* was reversed *sub silentio* by *Garrett* and its progeny.[9]

For the reasons explained below, we disagree with appellant and hold that *Fuller* and *Garrett* are distinguishable and that *Fuller* is controlling.

Fuller alleged that a venirewoman had been erroneously dismissed because of her views regarding the death penalty. *Fuller v. State,* 829 S.W.2d at 199. The venirewoman had stated that she would only affirmatively answer the special issues if the State proved that a defendant was a serial killer. *Id.* She was dismissed on the State's challenge that she was prejudiced against the law upon which it was entitled to rely. *Id.* We held that the trial court had not erred because the venirewoman was prejudiced against the law. We noted that the basis of our holding was "not that prospective jurors may be challenged for cause whenever they have strong personal feelings about the criteria to be used in assessing punishment[, b]ut that personal standards may not be allowed to supplant statutory punishment classifications." *Id.* at 200 [citing *Landry v. State,* 706 S.W.2d 105, 108 (Tex.Crim.App.1985)]. We further explained that "any prospective juror unable to consider the maximum penalty allowed by law for all legally death eligible candidates is biased against the law and, therefore, subject to challenge for cause." *Id.* This holding

9. *Wilson v. State,* 863 S.W.2d 59 (Tex.Crim.App. 1993); *Sigler v. State,* 865 S.W.2d 957 (Tex.Crim. App.1993); *Ransom v. State,* No. 71,633, 1994 WL 259057 (Tex.Crim.App. June 15, 1994) *mot. reh'g granted on other grounds.*

rests on the basic principle of law that jurors must be willing to set aside their personal prejudices and preferences regarding the death penalty to the extent that their views conflict with the law and interfere with their duties as jurors. *Id.* *Garrett* does not factually or legally present the same situation.

The venireman in *Garrett* did not require proof of any particular aggravating factor to find a defendant death eligible but merely stated that he could not on the facts of the offense alone find beyond a reasonable doubt that the defendant was a future danger. 851 S.W.2d at 857–859. We noted that though the law permits jurors to answer the special issues based solely on the facts of the offense being tried, there is no legal requirement that any juror ever do so, or even consider doing so. *Id.* at 859. We held that a juror's individual understanding of proof beyond a reasonable doubt may legitimately lead him or her to require more than the minimum used in an appellate sufficiency of the evidence review. *Id.* at 860.

Appellant argues under *Garrett* that a veniremember is not excludable merely because the "quantum of evidence" which she would require to impose the death sentence includes proof of some specific characteristic, e.g., that the defendant is a serial killer or has killed before. But, focusing on *Garrett,* appellant neglects the question of *Fuller,* that is, whether the potential juror's views of the death penalty conflict with the law and her duties as a juror. Since the venireman's views in *Garrett* were not in conflict with any law, we did not need to reach this question in *Garrett.* But, anticipating *Garrett,* we em-

phasized in *Fuller* that the venirewoman was disqualified not because she resisted imposition of severe sanctions, but because in her view "factors other than those prescribed by law" were "*absolute prerequisites*" for imposition of the death penalty. 829 S.W.2d at 200. We explained that these views biased the venirewoman against the law "[b]ecause our law does not categorically reserve capital punishment only for those who have murdered before, [and] neither may individual jurors." *Id.* And, we reiterated,

> [jurors] may, of course, hold that the absence of prior criminal history militates strongly against the death penalty. They may even find it difficult to imagine answering the second punishment issue affirmatively without convincing proof of past violence, regardless of other circumstances in the case. But they may not wholly refuse, before hearing any evidence whatsoever, to consider an accused for the death penalty unless he has been convicted of murder before.

*Id.*

 Today we unambiguously reaffirm our holding that potential jurors must be able to set aside their personal preferences and biases to consider as death eligible *all those defined as death eligible* by Section 19.03 of the Texas Penal Code and Article 37.071 of the Texas Code of Criminal Procedure.[10] Potential jurors may believe what they want regarding the death penalty, including the quantum of evidence they will require to impose a death sentence.[11] *See*

---

**10.** In so far as the resolution of the challenge to veniremember Smith in *Sigler,* 865 S.W.2d at 961, conflicts with our holding today, it is overruled. This does not affect the result of *Sigler,* however, since the dismissal of venireman Johnson was clearly in violation of *Garrett.* *Sigler,* 865 S.W.2d at 960–961.

**11.** Appellant seems to argue in part that *Garrett* overrules *Fuller* in so far as *Garrett* stands for the principle that jurors are free to determine the quantum of evidence required to convince them beyond a reasonable doubt that a defendant is a future danger. But, framing the argument in terms of the quantum of evidence required to prove future dangerousness beyond a reasonable doubt is not dispositive. The question remains whether the venireman's views conflict with the

law. Even a juror's views on the quantum of evidence required to convince him beyond a reasonable doubt do not allow him to displace the law and create his own categories of death eligibility. Defining the offense of capital murder punishable by death remains the duty of the legislature. Where the personal beliefs of a potential juror conflict with the law, rendering him unable to perform his duties under the law, the law prevails.

And, though a juror may choose to give whatever weight he wishes to particular evidence, he may not foreclose completely, through some personal bias, consideration of any evidence introduced at trial. If a potential juror states that he can never affirmatively answer an issue unless specific evidence which he requires is introduced, (e.g., that the defendant is a serial killer),

*Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). But, jurors may not substitute the legal categories of death eligibility with their personal preferences and biases and thereby place themselves above the law. If even complete opposition to the death penalty must bend to the law, so must the remainder of the Pandora's box of views held by potential jurors regarding the death penalty. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). To require anything less would give to juries an untrammeled discretion to gut our statutory definitions of death eligibility and thereby raise the specter of *Branch v. Texas,* decided with *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See also Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Since veniremembers Terrell and Adams unequivocally stated an unwillingness to set aside views regarding death eligibility which conflict with the statutory definitions of those eligible for the sentence of death, they were biased against the law. The trial court did not abuse its discretion in dismissing them for cause. **Appellant's sixth and seventh points of error are overruled.**

■■■■ Appellant's eighth point avers that the trial court erred in denying his challenge for cause to venireman S. Ambrosia. Appellant challenged Ambrosia on grounds that he was unable "to give *weight* to mitigating circumstances." [12] Appellant

objected at trial that because Ambrosia "strongly believes that a person is accountable for their own actions; notwithstanding, their background," he would not give any "weight" to mitigating circumstances and was, thus, biased against the law. Besides being inadequately briefed,[13] appellant's argument is directly contrary to strong precedent holding that potential jurors are not challengeable for cause merely because they refuse to give *weight* to particular "mitigating" evidence. *See, e.g., Coleman v. State,* 881 S.W.2d 344 (Tex.Crim.App.1994); *Allridge v. State,* 850 S.W.2d 471, 481–82 (Tex. Crim.App.1991), *cert. denied,* —— U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Moreover, though reluctant to give mitigating weight to background evidence, Ambrosia stated that he could consider certain, unspecified, facts to be mitigating and even conceded that background evidence would be helpful in determining whether the defendant was a future danger.[14] The record supports the trial court's decision. **Appellant's eighth point of error is overruled.**

■■■■ Appellant alleges in his ninth point that the trial court erred in denying his challenge for cause to venireman L. Ponzica. Appellant challenged Ponzica on grounds that he would be unable to disregard an unlawfully obtained confession, and was thus prejudiced against the law. Art. 35.16(c)(2); *See McCoy v. State,* 713 S.W.2d 940, 944 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). The State responds that the record does not support appellant's allegations; we agree. The record of Ponzica's voir dire examination

he has foreclosed consideration of other evidence of future dangerousness. And thus, again, his views conflict with the law.

**12.** In points of error eight through twelve appellant alleges in various grounds that the trial court reversibly erred in denying his challenges for cause to various veniremembers. We note that appellant's assertion of what is required to preserve error under these circumstances is incorrect. Appellant failed to note that he had to request additional peremptories after exhausting those given him by the trial court. *See, e.g., Chambers v. State,* 866 S.W.2d 9, 20 (Tex.Crim. App.1993). However, our review of the record does establish that appellant properly preserved error on these points.

**13.** Appellant only cites *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) in support of his argument, but it was decided on grounds that the trial court denied the admission of mitigating evidence not that a venireman could not consider specific mitigating evidence. 476 U.S. at 4, 106 S.Ct. at 1670–1671.

**14.** Appellant's voir dire examination as to whether Ambrosia could consider mitigating evidence was exclusively phrased in terms of the weight he would give appellant's "background." Background is not synonymous with mitigating evidence, and how much weight a venireman might give particular evidence is not asking whether he will consider mitigating evidence.

by appellant is confused and confusing. Ponzica was never directly asked and never clearly stated that he could not set aside an illicit confession if instructed to do.[15] When the record is confused, and without a clearly objectionable declaration by the venireman, we cannot second guess the trial court, and we must defer to the trial court's understanding of what actually occurred. *See Cantu v. State*, 842 S.W.2d 667, 681–682 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993), (*citing, Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *See also Trevino v. State*, 815 S.W.2d 592, 614 (Tex.Crim.App.1991) (Unless the venireman was clearly instructed on what the law requires, it cannot be said that he could not follow the law). *Rev'd on other grounds*, 503 U.S. 562, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992). Since the record does not show a clear abuse of a trial court's discretion, we will must affirm its decision. **Appellant's ninth point of error is overruled.**

■ In his tenth point of error, appellant alleges that the trial court erred in denying his challenge for cause to venirewoman G. Vaughn. Appellant challenged Vaughn on grounds that she was prejudiced against the law upon which the State was entitled to rely because she had stated that to assess the death penalty she would require evidence "beyond all doubt" instead of evidence "beyond a reasonable doubt."[16] The State counters that appellant's allegations are factually unfounded. We must agree that appellant's factual assertions are not supported by the record. Vaughn never stated that she would require evidence beyond all doubt. She did maintain that to vote for the death penalty, she "would not want any doubt," explaining that, "If the case had been proven beyond a reasonable doubt, then I should not have any type of sneaky suspicion that this isn't right and something else is missing." Vaughn's requirement that proof beyond a reasonable doubt not leave her with any "sneaky suspicion that something is not right" is congruent with our definition of beyond a reasonable doubt. *See Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App. 1991) (Proof beyond a reasonable doubt is of such a convincing character that one would act upon it *without hesitation* in the most important of one's affairs). Since the trial court's denial of appellant's challenge is supported by the record, we cannot hold that the trial court abused its discretion. **Appellant's tenth point of error is overruled.**

■ In point eleven appellant avers the trial court erred in denying his challenge for cause to veniremember E. Quintanilla. Appellant challenged Quintanilla because of "his failure to note the distinction between intentional and deliberate." *See Satterwhite v. State*, 858 S.W.2d 412, 417 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 455, 126

**15.** Appellant's counsel asked whether Ponzica could follow the court's instruction if the only evidence of guilt was an illegal confession and the court instructed the jury to disregard that *confession and enter a not guilty verdict.* Ponzica answered, "I guess it's a loop hole. It's there for you to use and it happens." Counsel replied, "Yeah." *Id.* Ponzica then stated, "I guess you'd have to in that situation." *Id.* Whether he meant that the defense would have to avail themselves of the legal technicality or that a juror would have to follow the court's instruct is unclear. Appellant's counsel, apparently also confused by the answer, attempted to clarify Ponzica's meaning. He asked, "What I'm attempting to do at this time, sir, is to see what you'd do. How you'd feel about it. Do you agree with that?" Naturally the venireman answered this multifarious question with an ambiguous response, stating that he would "not like it." *Id.* When Ponzica stated that he was confused about what the law required him to do, appellant's counsel attempted to inform him, stating, "No-

body is going to grab your hand and put it down there.... You would be instructed to and you either follow instructions or you wouldn't." This explanation only confused the venireman further, *with the result that* Ponzica never clearly stated that he could not follow instructions to disregard an illegal confession. He did state that regardless of the instruction, he would still like to find the defendant guilty of murder since the evidence proved beyond a reasonable doubt that he was guilty. What the venireman would like to do is irrelevant. Whether he can follow the law as instructed is the question, and it was not answered. *See Riley v. State*, 889 S.W.2d 290 (Tex. Crim.App.1993).

**16.** Because of the resolution of this point, it was unnecessary for us to reach the question of whether the defense may challenge a veniremember on grounds that they are prejudiced against the law upon which the State is entitled to rely.

L.Ed.2d 387 (1993). The State again responds that appellant's factual allegations are unsupported by the record. We agree with the State.

■ According to the record, Quintanilla stated that he did recognize a subtle legal distinction between the terms intentional and deliberate once it had been explained to him. Appellant then asked a number of confusing questions with the result that we cannot discern what Quintanilla ultimately answered.[17] —On redirect examination by the State, Quintanilla was informed that what he had said could be understood to mean that once having found a defendant guilty of capital murder, he would automatically vote affirmatively on the special issues. Quintanilla balked at this interpretation, stating, "I don't know if that's what I said but that's not what I meant." The State explained the law to the venireman, and he emphatically stated that he could and would follow the law, holding the State to its burden of proof on each of the special issues.

■ The totality of Quintanilla's voir dire suggests that he intended to follow the instructions of the court at each stage of the proceedings, and that he understood there to be a legal distinction between intentional and deliberate. If the voir dire is confused and the veniremember not clearly challengeable, and the veniremember states that he will meticulously follow the law after it is explained to him, the trial court has not abused its discretion. *See Satterwhite*, 858 S.W.2d at 417. **Appellant's eleventh point of error is overruled.**

■ In point of error twelve appellant alleges that the trial court erred by not allowing him to ask a proper question during his voir dire examination of venireman J. Edwards. Appellant complains that he was not allowed to ask Edwards what he understood "life imprisonment" to mean. The State argues that error, if any was harmless, because appellant received an answer from the venireman without objection or interruption from the State immediately following his question.

■ Where a trial court does not permit a capital defendant to ask a venireman a proper question the court has erred because it has denied him the opportunity to intelligently exercise his peremptory strikes. *Teague v. State*, 864 S.W.2d 505, 511 (Tex. Crim.App.1993). However, such error is in a capital case subject to a harmless error analysis. *Id.* at 512; *Gardner v. State*, 730 S.W.2d 675 at 690 n. 9 (Tex.Crim.App.), *cert. denied*, 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987). Tex.R.App.P. 81(b)(2). Without addressing the propriety of appellant's question, we hold that the court's prohibition was harmless beyond a reasonable doubt. According to the record, without objection from the State, the venireman answered appellant's question about what he understood the meaning of a life sentence to be as part of appellant's next question. In his next question, appellant asked Edwards to explain his views on the effectiveness of life imprisonment as a deterrent in comparison to capital punishment. Edwards answered in part, "I think it's universally known that [a] life sentence that doesn't mean that a person goes to prison and remains there until the [sic] die a natural death." **Appellant's twelfth point of error is overruled.**

■ In his thirteenth point of error, appellant avers that the trial court erred in sustaining the State's objection to the testimony of Dr. James W. Marquart and in excluding Marquart's testimony. The State counters that Marquart's intended testimony would not have assisted the jury in its deliberations and was properly excluded as irrele-

---

**17.** At the Defense's prompting, Quintanilla attempted to articulate a distinction based on his understanding that deliberate means that "he meant to do it ... He didn't aim to hit him in the ankle, he meant to put him out." Defense counsel then confused the venireman, telling him that his example of deliberate also meant intentional. We here note our own confusion; since all definitions of "deliberate" necessarily include the lesser *mens rea* of intentional, counsel's remark to the venireman was meaningless, and served only to confuse the venireman. The venireman then stated that he did not know what the difference was. Appellant then asked Quintanilla some very confused questions, the various interpretations of which we will not attempt to untangle.

vant and confusing. Tex.R.Crim.Evid. 401 and 403.

During the punishment phase of trial, appellant called Dr. Marquart, an associate professor of criminal justice at Sam Houston University. The State examined Marquart outside the presence of the jury, and established that Marquart did not intend to rebut any evidence, that he had not examined appellant or any material regarding appellant, and that he did not intend to testify specifically, through hypothetical or otherwise, about appellant or his personal situation. Marquart explained that he intended to testify that predictions about the future dangerousness of capital murder defendants, including predictions made by juries in answering the special issues under Article 37.071, had proven to be generally inaccurate. In essence, Marquart intended to testify that juries cannot accurately predict a criminal defendant's future conduct. The State objected to this testimony on grounds that since Marquart had nothing to offer regarding whether appellant himself posed a continuing danger to society, his testimony would not assist the jury in its deliberations. The State argued that Marquart's testimony was irrelevant and confusing. The trial court sustained the State's objections and excluded Marquart's testimony. On appellate review the trial court's rulings admitting or excluding evidence are subject to an abuse of discretion standard. *Matson v. State,* 819 S.W.2d 839, 850 (Tex.Crim.App.1991). If the trial court's decision was within the bounds of reasonable disagreement we will not disturb its ruling. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990).

Rule 401 of the Texas Rules of Criminal Evidence, defines relevant evidence as "evidence having any tendency to make the existence of any fact that is *of consequence to the determination of the action* more probable or less probable than it would be without the evidence." (emphasis added). To be relevant, evidence must be both *proba-*

*tive* and *material.* See Goode et al. *1 Texas Rules of Civil and Criminal Evidence; Texas Practice* §§ 401.1 & 401.2 (1993). If proffered evidence is not of consequence to a question at issue, it is immaterial, and thereby irrelevant. *Id. See also* McCormick, *Evidence* § 185 (4th ed. 1992). Marquart testified that he did not intend to address any characteristic or circumstance peculiar to appellant but to attack the validity of Article 37.071(b)(2) as a trustworthy indicator of deathworthiness. But, the validity of the special issue was not a question properly before the jury; as factfinder, the jury's task was to determine whether appellant "would commit criminal acts of violence in the future which would constitute a continuing threat to society." Art. 37.071(b)(2). That other juries have accurately or inaccurately predicted the danger posed by other defendants without an explanation specifically connecting the inaccurate predictions to appellant, was evidence of no consequence to the jury's factual determination. Telling the jury that other juries have inaccurately predicted the threat posed by other defendants, is like telling it that juries have wrongly convicted innocent people; even if true, it is, nevertheless, of no consequence in determining whether the particular defendant being tried is guilty, or, by analogy, whether the defendant is a continuing danger. Because it did not address appellant's individual propensity or lack of it for committing future acts of violence, such information simply is not of assistance in the factual determination before the jury. That is, Marquart's testimony did not help prove or disprove that appellant posed a continuing danger to society.[18] Thus, Marquart's intended testimony also lacked probative value. If Marquart's intended testimony had been particularized to illustrate that someone like appellant would not pose a continuing danger to society, then his testimony would have been applicable to an issue before the jury and have thereby been material and probative. *Cf. Matson,* 819 S.W.2d at 849 (hypothetical describing Matson). However, under

---

18. Similarly, Dr. Marquart's testimony was not proper expert testimony as it is described in Rule 702. Tex.R.Crim.Evid.

If scientific, technical, or other specialized knowledge will assist the trier of fact to under-

stand the evidence or to determine a fact in issue, a witness ... may testify.

Dr. Marquart's testimony was not intended to assist the jury to understand evidence or to determine a fact in issue.

Marquart's own description of his testimony, a trial court could reasonably conclude that his intended testimony was neither material nor probative of the issue for which it was offered, or any other issue before the jury, and it, therefore, cannot be said that the trial court abused its discretion in excluding the testimony as irrelevant. Tex.R.Crim.Evid. 401.

▮ Indeed, rather than assist in the jury's factual determination of the danger posed to society by appellant, Marquart's testimony would have confused and distracted the jury from its factfinding task. As Marquart himself described it, his intended testimony was in essence, if not form, an attack on the a constitutionality of Article 37.071. Marquart's testimony raised policy and legal arguments against the validity of Article 37.071(b)(2) as an accurate determinant of death eligibility. Legal and policy questions are inappropriate before the factfinder.[19] Thus, it was reasonable for the trial court to conclude that the risks of confusing the jury about legal and factual issues and distracting it from its factfinding task substantially outweighed the probative value of Marquart's testimony. Under these circumstances, the trial court did not abuse its discretion in excluding it. Tex.R.Crim.Evid. 403.

Appellant argues on appeal that his case is indistinguishable from *Matson v. State*, 819 S.W.2d 839 (Tex.Crim.App.1991). In *Matson* we reversed a capital murder conviction on grounds that the trial court had erred in excluding the testimony of a defense expert witness. But, appellant's reliance on *Matson* is misplaced; his case is both factually and legally distinguishable. The distinction rests in the nature of Marquart's testimony. Matson's expert, Harlin, was an expert on rehabilitation. Harlin intended to testify that the rate of recidivism for youthful offenders is inversely proportional to the length of incarceration; he was prepared to testify through hypothetical facts that a defendant of Matson's youth and with his record was a good

candidate for rehabilitation through long incarceration and that statistically speaking, someone like Matson would probably not commit criminal acts of violence that would constitute a continuing threat to society. *Id.* at 848–849. On review the State argued that Harlin's excluded testimony was "general" and not "particularized" to Matson; we rejected this argument as factually incorrect, pointing to Harlin's testimony based on hypotheticals. *Id.* at 852–853. Unlike Harlin, Marquart did not intend to testify about appellant's individual profile within the context of his studies and research. As Marquart described it, he intended to testify about the general inability of juries to accurately predict future behavior and through this testimony to attack the "root core" of Article 37.071(b)(2). He did not intend to testify about appellant specifically. Thus, Marquart's testimony was in fact general and not particularized and is factually distinguishable from *Matson.* This factual distinction underlies the legal distinction between the two cases.

The rationale for our holding in *Matson* was clear; Harlin's testimony should not have been excluded because a jury must have before it " 'all possible relevant information' *about the individual defendant* whose fate it must determine." *Id.* at 850 quoting *Jurek v. Texas*, 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976) (emphasis added). We explained, that the jury could "not be precluded from considering, as a mitigating factor, *aspects of a defendant's character or record and any of the circumstances of the offense*" proffered as a basis for a sentence less than death. *Id.* quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (emphasis added). And, we concluded: "*Lockett* thus underscored *Jurek*'s recognition that the constitutionality of the Texas scheme 'turns on whether the enumerated questions allow consideration of *particularized mitigating factors.*' " *Id.* quoting *Jurek*, 428 U.S. at 272,

---

19. The policy issue is within the providence of the legislature and executive; the statute and its recent amendments indicates their policy determinations. *See now* 37.071 § 2(b)(1). The legal questions are, of course, within the providence of

the courts; we agree with the United States Supreme Court's view that the future dangerousness question is appropriate. *Jurek v. Texas,* 428 U.S. 262 at 276–277, 96 S.Ct. 2950 at 2958–2959, 49 L.Ed.2d 929 (1976).

96 S.Ct. at 2956 (emphasis added). That juries cannot accurately predict future dangerousness of other defendants is not a mitigating factor peculiar to appellant or his case. Thus, the legal concern of *Matson*, that a defendant not be precluded from presenting evidence of some mitigating aspect of his character or record, is not applicable in appellant's case.

In conclusion, we hold that the trial court reasonably concluded that Marquart's testimony was not of "consequence to the determination" of an issue in this case and did not abuse its discretion in excluding it as irrelevant. Tex.R.Crim.Evid. 401. Furthermore, the record also supports the trial court's decision to exclude Marquart's testimony because its probative value was substantially outweighed by the danger of confusion of the issues. Tex.R.Crim.Evid. 403. **Appellant's thirteenth point of error is overruled.**

■■ In his fifteenth point of error appellant argues that the trial court erred in refusing to define the term deliberately in its jury instructions at the punishment phase of his trial. Since we have repeatedly and at length addressed this issue, deciding it against appellant, and since appellant presents no novel argument, we refer him to our precedent. *See, e.g., Chambers*, 866 S.W.2d at 27. **Holding that the trial court did not err in failing to define deliberate, we overrule appellant's fifteenth point of error.**

The judgment of the trial court is affirmed.

OVERSTREET, J., dissents.

CLINTON, Judge, concurring.

I write separately in this cause to address several points of error about which I believe a plurality of the Court protests too much.[1] Points of error one and thirteen have to do with whether evidence, proffered by the State and appellant respectively, was relevant, and hence admissible, at the punishment phase of trial. The plurality expounds at far greater length than need be to resolve these points of error. In points of error six and seven, involving claimed voir dire errors,

the plurality engages in an unfortunate and gratuitous attempt to harmonize impossibly dissonant caselaw. I will take up these points of error in the same order the Court does.

### I.

In his first point of error appellant argues the trial court erred to admit testimony that he had been arrested, but no-billed, for the murder of Charles Wilson occurring some six months before the offense in the instant cause was committed. There is some indication in the record that the grand jury no-billed appellant because the evidence it heard tended to indicate appellant killed Wilson in defense of a third party. Thus, the grand jury likely found that appellant killed Wilson justifiably. V.T.C.A. Penal Code, § 9.33. Because this was, therefore, a lawful act of violence, appellant maintains, it was simply irrelevant to the second special issue under former Article 37.071(b), V.A.C.C.P., which inquires whether there is a probability that a defendant found guilty of capital murder "would commit criminal acts of violence" constituting a continuing threat to society. Not being a "criminal" act of violence, the killing of Wilson does not tend to make more or less probable that appellant will commit more. See Tex.R.Cr.Evid., Rules 401 & 402. Moreover, appellant contends, whatever probative value the evidence has, if any, is "substantially outweighed by the danger of unfair prejudice[.]" Tex.R.Cr.Evid., Rule 403.

The plurality finds this contention indistinguishable from one we addressed in *Burks v. State*, 876 S.W.2d 877, 908 (Tex.Cr.App.1994). Op. at 807. In *Burks*, evidence of an extraneous offense was admitted into evidence even though prosecuting authorities had decided not to pursue the case against appellant for lack of evidence he was the culprit. We held that, so long as there was "clear proof" appellant committed the offense, its admission was authorized under Article 37.071, supra. *Id.*, at 909. See also *Adanandus v. State*, 866 S.W.2d 210, 233–34 (Tex.Cr.App.1993) (State need not prove defendant

---

1. The bulk of the Court's opinion today garners a majority vote. However, as I count it, the opinion of the Court disposes of points of error one, six, and seven, about which I write separately, only by a plurality of four votes. I therefore refer to the Court's opinion herein as a plurality.

committed extraneous offense beyond a reasonable doubt before it is admissible to prove future dangerousness at punishment phase of a capital case). But identity is not the issue here. Appellant does not contest that he killed Wilson. The issue is, assuming the grand jury found the killing was justified, whether it is relevant to prove appellant would commit criminal acts of violence constituting a continuing threat to society. Our opinion in *Burks* does not help much to answer this question.

The State contends that, even if justified, Wilson's killing has some tendency to show appellant would commit future unlawful acts of violence, and is therefore relevant under Rule 401. The argument goes that, especially in combination with the murders committed just six months later and prosecuted herein, the killing of Wilson, even if lawful, tends to show a lack of compunction about taking human life—a nascent taste for killing which came to fruition in the instant murders. It occurs to me that it was within the trial court's discretion to accept this inference, and rule the evidence relevant accordingly. As we said in *Montgomery v. State*, 810 S.W.2d 372, at 391 (Tex.Cr.App.1990) (Opinion on rehearing on Court's own motion):

> "Reasonable men may disagree whether in common experience a particular inference is available. Where there is room for such disagreement, an appellate court that reverses a trial court's ruling on relevancy accomplishes nothing more than to substitute its own reasonable perception of common experience for that of the trial court. The appellate court effectively displaces the trial court, commandeering a function institutionally assigned elsewhere."

We cannot say it was outside this "zone of reasonable disagreement" for the trial court to decide that even lawful violent conduct may, under the circumstances, have some tendency to make it more probable appellant would commit unlawful violent conduct in the future. *Id.* The trial court did not err to find the evidence relevant under Rule 401, and hence, admissible under Rule 402.

While a closer call, it is not clear that the trial court abused its discretion to refuse to exclude the evidence under Rule 403. Again, this is not a *de novo* review. *Montgomery,* supra at 392. Ordinarily we will defer to the trial judge, who is in a better position to gauge the State's need for the evidence and weigh that against the potential for unfair prejudice. In this case, the State's need may not have been great. On the other hand, neither was the potential for unfair prejudice. The jury was informed of the probable reason for the grand jury's no-bill. This tends to assure that the sentencing jury will not put evidence of Wilson's killing to any other use than to advance the inference for which the State has argued it was admissible, namely, to show appellant's budding bloodlust. On balance, I agree that the record supports the trial court's Rule 403 ruling.

### II.

I agree that the trial court did not abuse its discretion to grant State's challenges for cause against venirepersons Terrell and Adams, the subject of appellant's sixth and seventh points of error respectively. But I emphatically disagree with the reasons stated in the plurality opinion. Op. at 811–13. The venirepersons were challengeable for cause because they indicated that they would not answer the second special issue affirmatively on the basis of certain evidence, even if that evidence convinced them beyond a reasonable doubt that appellant would constitute a future danger to society. This is sufficient to distinguish them from venireperson Bradley in *Garrett v. State*, 851 S.W.2d 853 (Tex. Cr.App.1993). Instead of relying upon this simple distinction, the plurality attempts vainly to harmonize *Garrett* with *Fuller v. State*, 829 S.W.2d 191 (Tex.Cr.App.1992). It does not work.

### A.

*Garrett* was a capital murder prosecution. There the trial court granted a State's challenge for cause against venireperson Bradley, who had indicated that he could never answer the second special issue at the punishment phase affirmatively based on no more evidence than the facts of the capital offense itself. See former Article 37.071, (b)(2), supra. On appeal we observed, how-

ever, that a venireperson's categorical refusal to find a capital defendant would constitute a continuing threat to society based only on the facts of the offense did not amount to a bias against the law. We reasoned:

"[T]hat the law permits jurors to find future dangerousness in some cases on the facts of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite."

*Garrett,* supra, at 859 (emphasis in the original). Accordingly we held "that a venireman is not subject to challenge for cause merely because he indicates he would require more evidence than the legal minimum in order to answer special issue two affirmatively." *Id.,* at 860.

Thus, a venireperson who categorically refuses to answer the second special issue on nothing more than evidence of the capital offense itself may only be indicating that his threshold for proof beyond a reasonable doubt is somewhat higher than the minimum that the law recognizes as sufficient. Unless we are prepared to hold that jurors must always be convinced beyond a reasonable doubt on the basis of legally sufficient evidence, we cannot say that such a venireperson has a bias against the law. He does not hold the State to a higher burden than that required by law. As long as the law permits a range of "reasonable doubt," the individual venireperson who says he will hold the State to the high end of the range is not requiring anything that the law does not tolerate.[2] Unless reasonable doubt is a fixed point— unless, in other words, the law requires a jury to affirmatively answer the special issue whenever presented with legally sufficient evidence—a venireperson who will not be convinced beyond a reasonable doubt by the facts of the offense itself is nevertheless a venireperson who can follow the law. If the State does not want that venireperson to sit on the jury, it is obliged to use one of its statutorily allotted peremptory challenges to remove him. *Garrett,* supra, at 861.

The testimony of the venirepersons in this cause did not show an inability to answer the second special issue on the facts of the offense alone. Thus, the case is not on all fours with *Garrett.* Instead, the venirepersons stated they could never answer the second special issue absent a certain character of evidence. Terrell made it clear she would require evidence of a prior felony conviction. Adams indicated he would require a showing that appellant would kill again before he could answer the second special issue "yes." Nevertheless, the principle of *Garrett* applies equally to these venirepersons. If they meant that, absent a particular character of evidence, they would have a reasonable doubt whether an accused would constitute a continuing threat to society, then they have not proven themselves subject to a challenge for cause. The State must exercise a peremptory challenge if it wants such venirepersons removed.

This is not to say that a venireperson who maintains he would never answer the second special issue on the basis of the facts of the case itself, or, as here, on the basis of a certain character of evidence, is never properly the subject of a State's challenge for cause. It depends upon the reason he says he would never convict. A venireperson who says, for instance, that he would not answer the second special issue affirmatively even if the facts of the offense itself convinced him beyond a reasonable doubt that appellant would be a continuing threat to society, is subject to a State's challenge for cause, *Garrett* notwithstanding. Likewise, a venireperson who maintains he will require a certain character of evidence before answering the second special issue "yes," even if other evidence convinces him beyond a reasonable doubt appellant will be a future danger, is

---

2. Of course, a venireperson who requires proof to a level of confidence "beyond all doubt" is still challengeable for cause on the basis of inability to follow the law. E.g., *Coleman v. State,* 881 S.W.2d 344, 359–60 (Tex.Cr.App.1994); *Narvaiz v. State,* 840 S.W.2d 415, 427 (Tex.Cr.App.1992); cf. *Geesa v. State,* 820 S.W.2d 154, 162 (Tex.Cr.App.1991) (jury to be instructed, *inter alia,* that prosecution need not prove guilt "beyond all possible doubt").

also challengeable for cause. Such a venire-person really does hold the State to a higher burden of proof than the law allows. He has an agenda of his own for conviction, but one which bears no relation to the law. If he cannot set his personal agenda aside, he should be excused at the State's demand. See Article 35.16(b)(3), V.A.C.C.P. To the extent our opinion in *Fuller* supports this proposition, it is consistent with *Garrett.*

It is the burden of the challenging party to demonstrate that the venireperson he seeks to challenge is in fact incapable of, or at least substantially impaired from, following the law. *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App.1988) (Plurality opinion).[3] In the present context this means that before the trial court may sustain a State's challenge for cause on the ground that the veni-reperson will not answer the second special issue in the affirmative absent a certain char-acter of evidence, it must be demonstrated to the trial court that the venireperson's cate-gorical refusal is predicated upon something other than his understanding of proof beyond a reasonable doubt. Otherwise there is no indication the venireperson cannot follow the law, and the State has failed to carry its burden to show the venireperson should be excused.

Here the State did carry its burden, albeit, in all likelihood, inadvertently. Both Terrell and Adams testified they would not answer the second special issue "yes" absent a cer-tain character of evidence, *even if the evi-dence otherwise convinced them beyond a reasonable doubt that appellant would con-stitute a continuing threat to society.* The requirements of the law were adequately ex-plained to them, but they continued to main-tain that they would have to have a certain kind of evidence, even if other evidence would satisfy their personal threshold of proof beyond a reasonable doubt. This evinces a manifest unwillingness to follow the law, and the trial court did not abuse its discretion to grant a State's challenge for cause under Article 35.16(b)(3), supra. I therefore concur in the plurality's disposition

of these points of error. I cannot, however, join its opinion.

## B.

Instead of recognizing this basic distinc-tion, the plurality purports to reconcile *Gar-rett* with *Fuller v. State,* supra. It is a flawed, misguided, and ultimately unsuccess-ful endeavor, wholly unnecessary to dispose of this cause. *Fuller* is already an anachron-ism, and we should declare it so. That the plurality persists in its attempt to harmonize *Fuller* with *Garrett* tends to show only an irrational antipathy toward, mixed with a misunderstanding of, the latter.

In *Fuller* we held that a venireperson "may not wholly refuse, before hearing any evidence whatsoever, to consider an accused for the death penalty unless he has been convicted of murder before." 829 S.W.2d at 200. Based upon language like this in *Full-er,* the plurality today "unambiguously reaf-firm[s] ... that potential jurors must be able to set aside their personal preferences and biases to consider as death eligible *all those defined as death eligible* by Section 19.03 of the Texas Penal Code and Article 37.071 of the Texas Code of Criminal Procedure." Op. at 812. But after *Garrett,* of course, the quote from *Fuller* itself is no longer unquali-fiedly the law. A venireperson is not chal-lengeable when he says he would never an-swer the second special issue affirmatively without evidence of a prior murder if by that he simply means he does not think the State can convince him beyond a reasonable doubt that the accused will pose a future danger without such evidence. See Part IIA, *ante.* And the plurality's extrapolation from *Fuller,* to the effect that venirepersons must be will-ing "to consider as death eligible" any whom the law considers so, was rejected by the Court just recently, in *Riley v. State,* 889 S.W.2d 290 (Tex.Cr.App.1993) (Opinion on State's motion for rehearing). In fact, al-most every one of the premises *Fuller* relied upon has since been shot down by the Court in *Riley.*

3. Although *Hernandez* was overruled in part in *Fuller v. State,* 829 S.W.2d 191, 200 (Tex.Cr.App. 1992), rumors of its demise were greatly exagger-ated. For in *Riley v. State,* 889 S.W.2d 290 (Tex.Cr.App.1993), we revived *Hernandez* to the extent *Fuller* had overruled it.

To illustrate, let us examine *Fuller* more closely. The State challenged venireperson White for cause in *Fuller* because her opposition to death penalty was so strong that she could not personally consider the death penalty appropriate for any save a serial killer. The State apparently neither explained the special issues to her, nor inquired whether she could answer them without conscious bias or distortion, regardless of her personal views on the circumstances under which capital punishment are appropriate. The Court began its analysis in *Fuller* by pointing out that:

> "this Court no longer requires specific inquiry on that subject as a prerequisite to the exclusion of a prospective juror for prejudice against the death penalty. See *Farris v. State,* 811 S.W.2d 577 (Tex.Cr. App.1991 [1990]). Cases to the contrary, particularly *Hernandez v. State,* 757 S.W.2d 744 (Tex.Cr.App.1988) are, therefore, expressly overruled."

829 S.W.2d at 200. In *Riley,* however, we undercut this premise. There we made it manifestly clear that opposition to the death penalty—even categorical opposition to the death penalty—will not by itself sustain a State's challenge for cause under Article 35.16(b)(3). It must also be shown that the venireperson's opposition would cause him consciously to distort one of his answers to the special issues in order to prevent imposition of the death penalty. Of course, the only way the State can be assured of satisfying this burden is to make the very inquiry that *Fuller* says *Farris* dispensed with, *viz:* whether opposition to the death penalty will cause the venireperson to answer one of the special issues in such a way as to avoid the death penalty, irrespective of the evidence.[4] Accordingly, we overruled *Farris,* and reinstated the holding in *Hernandez* that *Fuller* had overruled. *Riley,* supra, at 300–301. Consistently with *Riley,* we must acknowl-

edge that venireperson White was erroneously excused for cause in *Fuller.* The State failed to meet its burden to show that her opinion that capital punishment should be reserved for serial killers would prevent her from abiding by the Article 37.071 punishment scheme.

*Fuller* also suggests that venirepersons may be challengeable for cause if they cannot accept that death may be an appropriate part of the range of punishment for a capital offense. *Id.,* at 200 ("Any prospective juror unable to consider the maximum penalty allowed by law for all legally eligible candidates is biased [against the law] and, therefore, subject to challenge for cause."). But this is another misconception that we subsequently laid to rest in *Riley.* There we observed:

> "Under former Article 37.071, [supra], any venireman who could answer the special issues according to the evidence, without conscious distortion or bias, could follow the law, irrespective of his willingness to 'accept' the death penalty in the abstract. As long as his rejection of the death penalty, however categorical, did not substantially impair his ability to abide by his oath to render a true verdict, it did not make him challengeable for cause under our law. 'He need not himself favor the penalty under any circumstances.' *Hernandez,* supra at 752."

889 S.W.2d at 301. Thus the plurality errs today to say that to be a qualified juror in a capital case, a venireperson must be able "to consider as death eligible all those defined as death eligible" under our law. All a venireperson need be able to do is honestly respond to the fact issues in Article 37.071, so that the law itself is not thwarted. He need not himself consider it an appropriate criteria for deciding who shall die. That the venireperson's "views conflict with the law," op. at

---

4. The State should simply ask the venireperson point-blank whether his categorical opposition to the death penalty will cause him always to answer that issue in such a way as to insure death will not be doled out, irrespective of the facts. Asking this simple question vastly simplifies the entire process. The venireperson who unswervingly maintains he will *not* invariably answer a special issue to prevent an execution may *not* be

excused for cause, consistent with the Sixth Amendment. Cf. *Riley,* supra. The venireperson who maintains just as adamantly that he *will* must be excluded upon the State's challenge. And the venireperson who genuinely equivocates or vacillates in his answer to the question is subject to challenge for cause, at the trial court's discretion. *Perillo v. State,* 758 S.W.2d 567, 577 (Tex.Cr.App.1988).

813, n. 11, makes not a whit of difference unless it is also shown that the conflict will cause him to misapply the law in a manner detrimental to the State.

Of course a venireperson's attitude about when capital punishment is appropriate cannot take precedence over what the law defines as death-eligibility. In order to meet its burden to show a venireperson will in fact allow his attitude to take precedence over the law, however, the State must explain the law to him, and ask him whether, given his "conflicting views," he can abide by it. In *Fuller*, the State did not ask these questions of venireperson White. After *Riley*, that "neither party took the time to explore [White's] views with a precision sufficient to resolve the ambiguity[,]" see *Fuller*, supra, at 201, must cut against the party with the burden, the challenging party, namely, the State. *Fuller* holds differently. When the time comes, it should be overruled.

Again, this is not to say that, under proper questioning, venireperson White might not have proven herself challengeable for cause, consistent with *Garrett v. State*, supra. Had she testified that unless the State proved Fuller was a serial killer, she would continue to harbor a reasonable doubt as to his future dangerousness, she would *not* be challengeable for cause. See Part IIA, *ante*. But she might have testified that even if other evidence did convince her beyond a reasonable doubt that Fuller would be a continuing threat to society, she still would not answer the special issue affirmatively absent evidence he was a serial killer. In that event she would most assuredly have been subject to a State's challenge for cause on the ground that she could not follow the law. See Part IIA, *ante*. This is so, not simply because she was unwilling to consider as death-eligible those that Texas law considers to be death-eligible. Under *Riley*, that is not enough. It is so because the State would also have shown that her "conflicting views" would cause her to misapply the law in this particular case.

That is what the State was able to show with respect to venirepersons Terrell and Adams in this cause. Thus the record supports the trial court's rulings granting the State's challenges for cause against them. For this reason, *not* those propounded by the plurality, points of error six and seven should be overruled.

### III.

The plurality also holds that the trial court did not abuse its discretion in refusing to admit appellant's proffered testimony from Dr. James Marquart, an associate professor of criminal justice at Sam Houston State University, over the State's objection that it was not relevant, and that in any event any probative value it had was substantially outweighed by the danger of confusion of the issues. Rules 401, 402 & 403, supra. Before Marquart testified in the presence of the jury, the State took him on a brief voir dire. Marquart proposed to testify regarding studies he has conducted of the accuracy of past jury predictions of future dangerousness of capital murder defendants. Without more, such testimony has no "tendency to make the existence of a fact of consequence ... more probable or less probable than it would be without the evidence." It simply says nothing about the probability, one way or the other, that *this appellant* "would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), supra. Appellant makes no real effort in his appellate brief to demonstrate otherwise.

This does not necessarily mean such testimony would be irrelevant, and therefore inadmissible, under every conceivable set of circumstances. It may be that Marquart was prepared to testify that in a significant majority of the prior capital cases in which the State had presented evidence of future dangerousness similar to that presented in the State's case-in-chief at the punishment stage of this trial, the defendant has not in fact proven over time to pose a continuing threat to any segment of society. If so, I for one would be inclined to view his testimony as relevant. Such testimony would supply an empirical basis for the proposition that the inferences of future dangerousness the State wants the jury to derive from its punishment evidence are not particularly compelling. It would to that extent tend to make it less

probable appellant would likely be a future danger to society than it would be without that evidence. See Rule 401, supra. In short, it would be relevant broadly to impeach the State's case.

Appellant made no offer of proof, however, to demonstrate exactly what else he might have had Marquart testify to. All we have to go on is the State's voir dire. We cannot simply presume that appellant would have elicited the kind of testimony that I am prepared to find relevant, under Rule 401, and hence admissible, under Rule 402. Appellant must make his proffer explicit on the record, or risk forfeiting any claim of error on appeal. Tex.R.Cr.Evid., Rule 103(a)(2). What the record reveals Marquart would have testified to, the trial court was within its discretion to find irrelevant. It was therefore permissible to exclude it under Rules 401 and 402. I would decline to reach the question whether the trial court could also properly have excluded it under Rule 403. There is no need.

### IV.

For the above reasons, I concur in the Court's judgment affirming the judgment of the trial court. However, I do not join the Court's opinion.

MEYERS, J., joins this opinion.

MALONEY, Judge, concurring.

I concur in the disposition of points of error one, six, and seven and otherwise join the opinion of the Court. The majority as to point of error one holds that evidence of a no-billed extraneous murder was admissible because it was relevant and its probative value outweighed any prejudicial effect. I disagree with that conclusion and write to emphasize the hazards involved in admitting such evidence during the punishment phase of a capital murder trial.

The evidence of the extraneous killing admitted in the instant case was not relevant to appellant's deathworthiness as a future danger to society. While appellant did not dispute his commission of the extraneous homicide, he instead asserted that the killing was justified because it was committed in self-

defense. That appellant acted justifiably in self-defense is supported by the testimony of the State's attorney who stated that a fair jury, upon hearing the evidence, would probably have found appellant acted in self-defense. A homicide in self-defense is legally justifiable under our Penal Code. Tex.Penal Code Ann. § 9.31. Evidence that an actor "defended himself against another's use or attempted use of unlawful force" does not have a tendency to make it more probable that appellant would be a continuing threat to society any more than would evidence of any lawful military conduct in combat which results in death of the enemy, or lawful actions of a police officer causing death in the line of duty.

If, however, appellant's justifiable homicide might be considered relevant to the issue of future dangerousness, the prejudicial effect of admitting such evidence would substantially outweigh any probative value. See Tex. R.Crim.Evid. 403. Action in protecting oneself against another's use of unlawful force demonstrates nothing about propensity for violence and therefore has *no* probative value on the special issue. However, the possibility that a jury would disregard the legally justifiable nature of such action and focus only on the fact that a death resulted is great.

The danger in admitting this type of extraneous conduct evidence at punishment in a capital case is compounded by the lack of a statutory requirement that it be proven beyond a reasonable doubt. See Tex.Code Crim.Proc.Ann. art. 37.071, § 2(a). However, before extraneous offense evidence may be introduced at the punishment hearing of a capital case, the State must "clearly prove" that an offense was committed and that the accused was the perpetrator. *Burks v. State,* 876 S.W.2d 877, 909 (Tex.Crim.App.1994); *Kemp v. State,* 846 S.W.2d 289, 307 (Tex. Crim.App.1992). This Court held in *Harrell v. State,* 884 S.W.2d 154, 161 (Tex.Crim.App. 1994), and reaffirmed in *George v. State,* 890 S.W.2d 73, 76 (Tex.Crim.App.1994), that, in the context of guilt/innocence, the clear proof standard is the same as proof beyond a reasonable doubt. Accordingly, it is at least arguable that an extraneous offense offered

during the punishment phase of a capital murder trial be proven beyond a reasonable doubt. *But see Powell v. State,* 898 S.W.2d 821, 830 (Tex.Crim.App.1994).

These comments aside, I concur in the Court's disposition of point of error one because in light of the other evidence in the record offered to show appellant's future dangerousness, any error in admitting the extraneous homicide was harmless. I also concur only in the disposition of points of error six and seven, and otherwise join the opinion of the Court.

BAIRD, Judge, opinion concurring in part and dissenting in part.

I agree that no error at the guilt/innocence phase of appellant's trial was sufficient to warrant reversal of his conviction. Therefore, I join part II. of Judge Clinton's concurring opinion and join only that portion of our judgment which affirms appellant's conviction. However, I dissent to the resolution of appellant's first point of error which relates to the punishment phase of appellant's trial.

Appellant's first point of error raises the following question: "Can *lawful* conduct ever be relevant to establish a probability the defendant would commit *criminal* acts of violence in the future?" For the following reasons, I believe the question must be answered in the negative.

### I.

Appellant contends the trial judge erred at the punishment phase of trial in admitting evidence of an alleged offense for which appellant had been no-billed. The record establishes that appellant, in order to protect his brother, fatally shot an individual. The incident was referred to a Harris County Grand Jury and appellant was no-billed.

1. The majority argues the Grand Jury had no authority to determine whether the homicide was justifiable in returning a no-bill. *Ante* at 807. The majority cites no authority for that proposition and the uncontroverted evidence presented by the State, shows the Grand Jury made that determination.

2. In support of its admissibility, the State argued: THE STATE: Judge, all we propose for this witness to show is that the defendant was charged in the homicide of [the victim]. We

The assistant district attorney who presented the case to the grand jury testified, in the instant case, as follows:

> ... [The victim] either had a knife or appeared to be reaching in his pants for a knife and [appellant], pushed [appellant's brother] out of the way and shot [the victim].... I told [the Grand Jury] what the circumstances of the case were and ... I said they could conclude that [appellant] was in fear of his brother's life.... I believed that the evidence was such that a fair jury would probably have concluded that it was self-defense and I believed that the Grand Jury's decision to conclude *that it was self-defense was justified.*[1]

This evidence was offered for the express purpose of proving future dangerousness.[2]

### II.

Upon conclusion of the presentation of the evidence at the punishment phase of a capital murder trial, the trial judge submits to the jury the statutory punishment issues of Tex. Code Crim.Proc.Ann. art. 37.071. In the instant case, the relevant punishment issue concerns future dangerousness and asks:

> whether there is a probability that the defendant would commit *criminal* acts of violence that would constitute a continuing threat to society;

Before the jury can affirmatively answer this issue, the State must prove beyond a reasonable doubt a probability exists the defendant would commit *criminal* acts of violence.

To resolve this issue, our law provides for the admission of evidence the trial judge deems relevant to sentence. Tex.Code Crim. Proc.Ann. art. 37.071.[3] Tex.R.Crim.Evid. 401 defines relevant evidence as:

> think that is relevant under 37.071. We can show arrest. We can show relevant information in a capital trial to *show the defendant's propensity for dangerousness.*

3. Sec. 2(a) provides in pertinent part:

> ... evidence may be presented by the state and the defendant or the defendant's counsel as to *any matter that the court deems relevant to sentence,* including evidence of the defendant's background or character of the circumstances of the

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Tex.R.Crim.Evid. 402 provides that all relevant evidence is admissible and evidence that is not relevant is not admissible.

In the instant case, the trial judge admitted evidence that appellant caused the death of an individual. Our penal code provides that a person is justified in using deadly force against another to protect a third person. Tex.Penal Code Ann. § 9.33. The State's witness, an assistant district attorney who presented the case to the Grand Jury, conceded appellant's conduct was justified under § 9.33. Justifiable conduct is conduct that is sanctioned by law. *Black's Law Dictionary* 865 (6th ed. 1990). Consequently, the trial judge found that appellant's *lawful* conduct was relevant to resolve the issue of whether there was a probability that appellant would commit *criminal* acts of violence. I believe this was error.

Justifiable homicide is *not* unlawful.[4] Therefore, it cannot have any tendency to establish the probability that a defendant would commit *criminal* acts of violence. Consequently, I would hold that justifiable conduct is only relevant to the extent it mitigates against the imposition of the death penalty. Art. 37.071, § 2(a). Such evidence is not admissible to establish the probability that a defendant would commit criminal acts of violence.

For these reasons, I would sustain appellant's first point of error and remand the case to the trial court for a new punishment hearing. Tex.Code Crim.Proc.Ann. art.

44.29(c). Because the majority does not, I respectfully dissent.

---

offense that mitigates against the imposition of the death penalty. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas....

4. Tex.Penal Code Ann. § 1.07(a)(48) provides:

"Unlawful" means criminal or tortious or both and includes what would be criminal or tortious *but for a defense amounting to justification* or privilege.